McHUGH v. CITY OF DEARBORN.

1. MUNICIPAL CORPORATIONS—ZONING ORDINANCES—PRESUMPTION OF CONSTITUTIONALITY.

A municipal zoning ordinance is presumed constitutional and the burden of showing that it has no substantial relation to public health, morals, safety or general welfare rests upon those who claim it to be unconstitutional.

2. SAME—ZONING ORDINANCES—REASONABLENESS.

A zoning ordinance must be reasonable, and the reasonableness becomes the test of its legality.

3. SAME—ZONING ORDINANCES—RESIDENCE USE—CONFISCATION.

Finding of trial court that zoning ordinance provision restricting use of plaintiffs' 12-acre tract to residence use, except 110 feet back from 1 of 2 main, abutting arterial thoroughfares, was unconstitutional as unreasonable and confiscatory as applied to plaintiffs' property, *held*, supported by the proofs submitted, where it appears it was surrounded by property devoted to business uses, public and semipublic uses and had a river running through some of it with low water and attendant odors in the summer and was across the street from property devoted to a mental institution.

Appeal from Wayne; Fox (Noel P.), J., presiding. Submitted January 16, 1957. (Docket No. 52, Calendar No. 47,061.) Decided May 17, 1957.

Bill by Thomas McHugh and Margaret D. McHugh against the City of Dearborn, a municipal corporation, and certain of its officials, to declare zoning ordinance invalid as to their property. Decree for plaintiffs. Defendants appeal. Affirmed.

REFERENCES FOR POINTS IN HEADNOTES
[1] 58 Am Jur, Zoning §§ 16, 256.
[2] 58 Am Jur, Zoning § 21.

*Thomas F. Chawke* (*John S. Gavran,* of counsel), for plaintiffs.

*Dale H. Fillmore,* Corporation Counsel, *Carl P. Garlow* and *Frank C. McCann,* Assistants Corporation Counsel, for defendants.

SHARPE, J. This is a zoning ordinance case in which it is asserted that the ordinance as to plaintiffs' property in the city of Dearborn is unreasonable, discriminating and unconstitutional. The essential facts necessary to a decision are as follows.

Plaintiffs are residents of the city of Detroit and are the owners of an unplatted parcel of land situated in the city of Dearborn. The land consists of 12 and a fraction acres. It is located on the northwest corner of Michigan avenue and Outer Drive. It is irregular in shape. It has a frontage of approximately 92.47 feet on Michigan avenue and approximately 744.09 feet on Outer Drive. From Outer Drive it extends westerly approximately 1,100 feet. The property in question is, in part, low and unlevel. A branch of the Rouge river flows through the northerly part of the land. On the northeast corner of Michigan avenue and Outer Drive is a parcel of land consisting of 33 acres which is occupied by St. Joseph's Retreat, an institution licensed for the care and treatment of mental patients. This property has a frontage on Michigan avenue of approximately 1,465 feet and approximately 678 feet on Outer Drive.

Immediately north of plaintiffs' property are 26 and a fraction acres of undeveloped land owned by the school district of Dearborn. The property immediately north of St. Joseph's Retreat, consisting of approximately 37 acres, has a frontage of approximately 2,571 feet on Outer Drive. It is also undeveloped and owned by the school district of

Dearborn. The area to the west of plaintiffs' prop-erty on Michigan avenue is zoned and largely used for business purposes. Michigan avenue is the main business thoroughfare in the city of Dearborn and is designated as US trunk line No 112. Outer Drive extends from the village of Grosse Pointe Park through the city of Detroit and through the city of Dearborn. Both streets are used extensively. All of Michigan avenue frontage extending back 110 feet, including plaintiff's property, is zoned for uses per-mitted in a business "B" district.

Plaintiffs' land is zoned under ordinance No 33 of the city of Dearborn for uses permitted in a resi-dential "A" district, except that portion on Michi-gan avenue which extends 110 feet north of and parallel to the property line of Michigan avenue for uses in a business "B" district.

The cause came on for trial, at which time plain-tiffs offered evidence from a registered land survey-or, a city land planning engineer, a registered archi-tect and 3 real-estate men who testified that the premises were unsuitable for residential homes and that the best use of the property would be for busi-ness purposes.

Defendant city of Dearborn produced the attorney for the Wayne county board of road commissioners who testified that the board planned to acquire a portion of plaintiffs' lands for flood control. A Dear-born planning technician testified that a portion of plaintiffs' property consisting of highlands could provide for 13 residential lots. An assistant engi-neer for the city of Dearborn testified that homes could be safely built on plaintiffs' property. A real-estate appraiser testified that the property in ques-tion could be laid out and used as a single-family subdivision.

The cause came on for trial and at its conclusion the trial court entered a decree enjoining the city

of Dearborn and its officials from enforcing the
mentioned ordinance against that portion of plain-
tiffs' property now zoned for residence "A" prop-
erty and from preventing or interfering with the
use by plaintiffs of the property for business "B"
uses.

Defendants appeal and urge that the zoning ordi-
nance has a substantial relationship to the public
health, safety and welfare. The trial court in an
opinion stated:

"This area is distinguishable from all other sub-
.divisions which the court viewed. At most, it would
provide a maximum of 13 isolated residential
buildings. Other areas, in the range of Michigan
avenue and the River Rouge or New York Central
Railroad, contain space for and was occupied by
upwards of hundreds of homes, all of which makes
the other areas properly and adequately suit-
ed for residential purposes. These 13 lots would
be near '2 of the heaviest trafficked arteries in the
city of Dearborn with the consequent noise, gasses,
commotion, and hazards. It would be surrounded
on 3 sides by practically all commercial and semi-
public or public uses. To the north would be a
school playground activity. This isolation, together
with its topography, with the overflowing influences
of the adjacent commercial uses and the huge vol-
ume of motor vehicle traffic, depreciates its resi-
dential use value to a confiscatory degree. It sets
this property apart as being incomparable with the
other residential areas viewed by the court.

"The court must give consideration in determin-
ing whether a zoning ordinance is unreasonable
and confiscatory to the extent to which property
values are diminished by the provisions of the appli-
cation of the zoning ordinance together with all the
other evidence in the case.　*　*　*

"Since this property is isolated from any immedi-
ate extensive residential area, no resulting prejudice

to owners of residential property in the vicinity can occur by a commercial use."

It is the generally accepted law that a zoning ordinance is presumed constitutional and the burden of showing that it has no substantial relation to public health, morals, safety or general welfare rests upon those who claim it to be unconstitutional. It is also the rule that a zoning ordinance must be reasonable, and the reasonableness becomes the test of its legality.  See *City of North Muskegon* v. *Miller,* 249 Mich 52.

The opinion of the trial court finds support in the evidence given by Don C. Geake, a city land planning engineer, who testified:

"*Q*. In your opinion would the erection of houses on these 13 lots as per exhibit 'E' be an economical investment for a builder?

"*A*. No.

"*Q*. Why not?

"*A*. Well, where would he get mortgage insurance?  He could build them conventionally and possibly obtain some funds to build them in that manner.  I feel the resale value of them would have to be certainly of a low nature beyond the competitive homes in other areas that have refinement to offer. The feasibility would seem unlikely to me because they couldn't compete with the present market conditions and desirability of other areas of competing homes."

Harry C. Vicary, an architect, testified:

"*A*. I have lived in Dearborn for a considerable time.  I know the Rouge river develops a great stench in the summer when the water is at low level. I feel that the area involved is rather low, that it would have to take in that portion of the property that is about 6 feet below Michigan avenue level and that it would be fairly low for a good group of residences.  I feel that 13 or 14 possible lots there.

would be a very small group of homes, not sufficient to establish a desirable neighborhood and I doubt if it would be economical considering the public improvements that would be necessary to develop for residential purposes. * * *

"Traffic on Michigan avenue is terrific. One of the outstanding things to observe while in the office is the many trips that the ambulances, fire apparatus and siren-equipped vehicles make up and down the street. It is a continuance [continuous?] all night disturbance and the rumbling of large trucks down Michigan avenue is of constant occurrence. It does not make any difference how close you are to the railroad it disturbs you. Up to several thousand feet you still get the rumbling of the railroad train. There are many very long trains. I have counted 100 freight cars in 1 train passing along the railroad. Eighty to 90 cars to a freight train is not uncommon at all. As to smoke with present use of diesels, there is not as much objection as in the past with steam engines. Diesel engines occasionally can develop a terrific smoke. However, that is not common. What percentage of the engines are diesel powered I do not know."

Paul V. Stachel, a real-estate dealer, testified:

"One of the reasons this land is not suitable for residential purposes is that it would produce more money for the owner if used for business purposes. A number of single-family residences are not considered an investment, since a single house is an investment only when used as a rooming house. I would not build single residences there. I did not make an analysis of the costs involved in developing plaintiffs' property for residential uses as distinguished from business uses. The owner in my opinion would lose money if he developed this property for residential uses. He would make a lot of money if he developed it for commercial purposes."

Russell L. Langlois, a real-estate broker, testified:

"The property is not suitable for residential purposes. The presence of St. Joseph's Retreat, a mental institution which has been there for 40 or 50 years constitutes a depreciating factor. My office is on Michigan avenue and I have put 14 years in there. I know the noise and nuisance from the railroad and from the trucks; motor vehicles in general create an awful nuisance. Michigan avenue is dirty and noisy. Who would want to build a home in that district. The property is too close to Michigan avenue. I have sold a number of groups of lots to builders. It would be impossible on account of the topography of the property to sell lots in there to them for the purpose of erecting residences. The Rouge river overflows and the smell from the summer renders the property undesirable to live there. You have only a small parcel upon which it would be possible to build on. When I first came to Dearborn I attempted to sell lots on Geneva and the sales resistance was terrible. I worked on them and could not sell them. While other lots in other parts of the city during the last 14 or 15 years have tripled in value, these have not.

"*Q.* Well, what, in your opinion, is the best use for this property?

"*A.* Why there is no question that the best use of this property would be for business purposes, commercial purposes."

Another real-estate dealer, Michael John Cafferty, testified:

"I have been on the McHugh property several times and have passed it 2 or more times per day during the last 5 years. I examined it with a view to determining its suitability for residential use. It is not desirable for residential uses because of the adjoining conditions; the Rouge river, business and traffic on Michigan avenue, traffic on Outer

Drive, smell from the river, noise from fire engines, police cars and ambulances. It is not just adaptable for residential use. I would not mention it to any person for a residence because it just is not suited for it.

"The corner of Michigan avenue and Outer Drive is a principal intersection. I have had occasion to observe the vehicular traffic on both streets for a number of years. About 40,000 cars pass that intersection every 24 hours, going east and west on Michigan and about 10,000 cars pass Outer Drive at this intersection, going north and south. There is a traffic light controlling traffic on Michigan and Outer Drive. There are no left turns permitted off Outer Drive on to Michigan. There is an awful lot of traffic turning right off Outer Drive to go east on Michigan avenue."

In our opinion the findings of the trial court are amply supported by the proofs submitted at the trial. The decree of the trial court finding that the zoning ordinance is unreasonable and confiscatory as applied to plaintiffs' property is affirmed, with costs to plaintiffs.

DETHMERS, C. J., and SMITH, VOELKER, KELLY, CARR, and BLACK, JJ., concurred with SHARPE, J.

EDWARDS, J. (*concurring*). I concur with Justice SHARPE's result.

"A zoning law, to be valid, must carry with it the necessary incidents to a proper exercise of the police power, and in this respect it has been held that the regulation of the development of a city under a comprehensive and carefully considered zoning plan tends to promote the general welfare of a community, and that the adoption and enforcement of such plan, when fairly conceived and equably applied, is within the scope of the police power." 58 Am Jur, Zoning, § 27, p 957.

The record and the findings of the trial judge in this case show almost complete isolation of the instant property from other property residentially zoned or developed. This fact would argue against the currently-considered zoning being a part of a general and comprehensive plan of community betterment.

I do not agree with my Brother's citing the testimony of a real-estate dealer, "He would make a lot of money if he developed it for commercial purposes," as in any way causally related to this result. Our test of the constitutionality of a zoning ordinance is whether or not its adoption represents a reasonable use of the police power in promoting the health, morals, safety or general welfare of the community. *Fass* v. *City of Highland Park,* 321 Mich 156; *Northwood Properties Company* v. *Royal Oak City Inspector,* 325 Mich 419; *Hitchman* v. *Township of Oakland,* 329 Mich 331.